690 So.2d 203 (1997)
Paula BADEAUX
v.
STATE of Louisiana, DEPARTMENT OF TRANSPORTATION AND DEVELOPMENT.
No. 96-CA-853.
Court of Appeal of Louisiana, Fifth Circuit.
February 25, 1997.
Writ Denied May 1, 1997.
*204 Nel F. Vezina, Andree Matheren Cullens, Special Assistant Attorney Generals, Gretna, LA, for Appellant State of Louisiana, Department of Transportation and Development.
Carolyn A. Mcnabb, Houma, LA, for Appellee Paula Badeaux.
Before GRISBAUM, BOWES and CANNELLA, JJ.
CANNELLA, Judge.
Defendant, State of Louisiana, Department of Transportation and Development (DOTD), appeals from a judgment in favor of plaintiff, Paula Badeaux, who was injured in a one car accident. We affirm.
At approximately 3:30 p.m. on September 19, 1990, plaintiff was a passenger in a pick-up truck owned and driven by Dave Zeringue (Zeringue), her future husband and a police officer of 17 years. The truck was traveling eastward on River Road (Highway 18), a two-lane highway in Jefferson Parish, Louisiana. The roadway abuts the Mississippi River levee. At the time, plaintiff worked for Zeringue in a lawn service business. Zeringue was bringing plaintiff home after work when a tire suddenly deflated near the Monsanto Chemical Plant. The vehicle had just come out of a curve, but was traveling in a straight-a-way at between 35 and 40 miles per hour. When the right rear tire blew out or somehow deflated, the truck veered to the right side of the road onto the extremely narrow shoulder of the eastbound lane. Zeringue did not apply his brakes or attempt to stop because, as he declined into the ditch, he saw a culvert ahead and was afraid that if he hit it they would be killed. He had traveled approximately two hundred and seven feet on the one to two foot steeply sloping, soft shoulder when he tried to re-enter the highway. Unfortunately, he over-corrected, crossed into the westbound lane and overturned. The truck came to rest on its side on the Mississippi River levee. Both Zeringue *205 and plaintiff lost consciousness and suffered injuries in the accident. Zeringue hurt his cervical and lumbar spine and plaintiff sustained serious injuries to her left knee.
Suit was filed against DOTD by both Zeringue and plaintiff on July 23, 1991. A judge trial was held on December 6, 1995 and January 17, 1996. On June 12, 1996, the trial judge rendered judgment finding DOTD 75% at fault and Zeringue 25% at fault. He awarded damages to Zeringue of $42,126 and to plaintiff of $308,825.85.
On appeal, defendant asserts that the trial judge erred in awarding $200,000 in general damages to plaintiff, when she failed to mitigate her damages by failing to follow her physician's instructions to lose weight. Defendant also contends that the trial judge erred in considering the Highway Structural Sufficiency Rating of 1968 and evidence of minimum tolerable conditions because 23 U.S.C. 409 makes data compiled and collected by the DOTD inadmissable.
In defendant's first error, it contends that plaintiff was extremely overweight and that she was instructed to lose weight in order to minimize the problems with her knee. Defendant asserts that the trial judge recognized this in his reasons for judgment and, thus, should have reduced her award.
Plaintiff contends that the evidence showed that plaintiff had a history of weight problems. She weighed over 200 pounds when the accident occurred. However, she gained weight after the accident because she could not walk for exercise.
Plaintiff's physician, Dr. William Kinnard, testified that plaintiff suffered "a torn anterior cruciate ligament, a torn posterior cruciate ligament, a torn medial collateral ligament, a torn postero-medial joint capsule, a tear around the peripheral or outer edge of the medical meniscus and a detachment of the anterior horn or the anterior front portion of the lateral meniscus."[1] Dr. Kinnard surgically repaired everything except the anterior cruciate ligament, which was injured beyond repair. Plaintiff wore a leg cast for eight weeks. When it was removed, she was placed into a knee brace and sent to physical therapy. In January 1991, Dr. Kinnard concluded she would not be able to return to her prior job activities because she would not be able to stand or walk for more than one hour at a time. He restricted her to sitting work only. As of April 1991, plaintiff was still wearing the brace and attending therapy. In June, she began to complain of low back pain and pain in the right arm and shoulder. Dr. Kinnard attributed that to the lengthy period plaintiff was on crutches. One year post-surgery, Dr. Kinnard stated that plaintiff reached maximum medical improvement. At that time Dr. Kinnard concluded that she had a 50% physical impairment to the knee. However, plaintiff subsequently complained about new symptoms. In November of 1991, she developed a "clunking sensation" in the knee, which the doctor stated was from ligament instability. He suspected meniscal pathology and an Magnetic Resonance Imaging (MRI) test was discussed, but plaintiff is claustrophobic. They determined that an arthrogram might be an alternative, if the symptoms continue. In January 1992, Dr. Kinnard provided a new knee brace for plaintiff.
The doctor testified that plaintiff's prognosis is poor. He stated:
Based on the degree of injury, the severity of the injury and her size, I think she's gong to have ongoing problems with the knee and will never, ever be normal. Realistically, her prognosis is actually poor from a more realistic standpoint. Because of the instability, she will have more rapid deterioration of the joint. She will likely need some type or intervention with surgery in the future.
Dr. Kinnard testified that plaintiff may be a candidate for a total knee replacement, which is a procedure that must be repeated every ten years. However, he felt that at this point in time she was too young and said that "she's too big to consider that." Plaintiff was only 28 years old at the time of the accident. Dr. Kinnard stated the other alternative is a knee fusion, where the joint is mended solidly together. This would prevent her from bending the knee. Plaintiff *206 would have to swing the leg out laterally to walk. The doctor noted that either surgery requires extensive and difficult rehabilitation efforts. In any case, plaintiff can expect continued pain for the rest of her life.
Dr. Charles Johnson agreed with this diagnosis and the resulting treatment and prognosis.[2] His only reference to plaintiff's weight was that her added weight has caused significant acceleration of the degenerative changes and that if she made a "strong effort" to lose weight, it may help the pain and the feeling of giving way which plaintiff experienced in her knee.
Plaintiff testified that she has been overweight all of her life and has had difficulty losing weight. However, she stated that the manual work she did pre-accident, along with regular walks, helped her keep her weight stable at around 230 pounds.
The appellate court should rarely disturb an award of general damages. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993). Before an award of damages can be modified by the appellate court, the court must determine that the trier of fact abused its great discretion. Theriot v. Allstate Ins. Co., 625 So.2d 1337, 1340 (La.1993); Youn v. Maritime Overseas Corp., 623 So.2d at 1261; Tartar v. Hymes, 94-758 (La.App. 5 Cir. 5/30/95); 656 So.2d 756,760-761.
..."[i]t is only after articulated analysis of the facts discloses an abuse of discretion, that the award may on appellate review be considered either excessive or insufficient," Reck v. Stevens, 373 So.2d 498, 501 (La. 1979) ... In order to make this determination, the reviewing court looks first to the individual circumstances of the injured plaintiff. Only after analysis of the facts and circumstances peculiar to the particular case and plaintiff may an appellate court conclude that the award is inadequate. See Reck v. Stevens, supra; Cariere v. State Farm Insurance Co., 467 So.2d 867 (La.App. 2d Cir.1985).
Theriot v. Allstate Ins. Co., 625 So.2d at 1340.
When the court decides that the award is beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances, the appellate court should increase or reduce the award. Youn v. Maritime Overseas Corp., 623 So.2d at 1261 (La.1993); Tartar v. Hymes, 656 So.2d at 760-761. But the court can only raise (or lower) the award to the highest (or lowest) point which is reasonably within the discretion afforded the trial court. Theriot v. Allstate Ins. Co., 625 So.2d at 1340; Coco v. Winston Industries, Inc., 341 So.2d 332 (La. 1977).
The trial judge noted that a weight loss would be beneficial to plaintiff's recovery, but noted she is unable to exercise due to the damage in her knee. However, in discussing the lost wage aspect of her damages, he commented that with a little more motivation, she could lose weight, acquire more education and training and have a greater earning capacity than before the accident.[3] Nonetheless, he apparently did not conclude that she failed to mitigate her damages or was somehow at fault for her continuing problems in the knee because she did not lose weight. Otherwise, he would have mentioned it in his detailed, thirty-two page reasons for judgment. After our review, we find that plaintiff had severe injuries to her knee which has residual long-term effects. In order for this court to modify the award, we must find that the trial judge abused his discretion. Based on these facts, we find that the award for general damages was not an abuse of discretion and that the trial judge did not err.
Next, defendant argues that in reaching his conclusion that it was liable for the damages, the trial judge erroneously considered evidence that is precluded by amended 23 U.S.C. 409.
*207 The evidence showed that defendant had completed a road project on the River Road one month before the accident. At that time, defendant widened the lanes, covered the ditch on the levee or west side of the road, widened the embankment to cover the ditch, resurfaced the roadway and placed drainage pipes beneath the road from the levee side to the remaining ditch on the opposite side of the road. Defendant referred to this project as an overlay. Plaintiff referred to the work as a reconstruction.
23 U.S.C. 409 states:
Sec. 409. Discovery and admission as evidence of certain reports and surveys.
Notwithstanding any other provision of law, reports, surveys, schedules, lists, or data compiled for the purpose of identifying, evaluating, or planning the safety enhancement of potential accident sites, hazardous roadway conditions, or railway-highway crossings, pursuant to sections 130, 144, and 152 of this title or for the purpose of developing any highway safety construction improvement project which may be implemented utilizing Federal-aid highway funds shall not be subject to discovery or admitted into evidence in a Federal or State court proceeding or considered for other purposes in any action for damages arising from any occurrence at a location mentioned or addressed in such reports, surveys, schedules, lists, or data. (Emphasis Added)[4]
The trial judge found that no federal funds were used in the highway project preceding the accident. We agree and find that the statute is inapplicable. However, even if the statute is applicable, we find that the trial judge was not manifestly erroneous based on the other evidence (excluding the potentially excludable highway structural sufficiency rating of 1968 and the minimum tolerable conditions, which are conditions used to do priority ratings).
The testimony of Louisiana State Police Trooper Craig Guidry, the investigating officer, shows that the eastbound lane was bordered by a narrow shoulder, one to two feet wide declining three feet into a ditch. James Clary, Sr., plaintiffs' expert in the fields of highway design, highway safety, traffic engineering and land surveying testified that the highway was defective in its shoulder width, lane width, number of lanes, curvature, general alignment and volume to capacity ratio. He noted that the road's shoulders were composed of what looked like clam shell and sand, were fairly soft and would leave footprints when walked upon. As a result, the shoulders were unstable. Dr. Clary said that the water coming across the road from the levee into the ditch left the shoulder eroded in spots, represented by small gullies in photographs of the area. Furthermore, because the shoulder where plaintiff went off the road was so narrow, it was not sufficient to allow Zeringue to recover from the instability caused by the deflated tire. Dr. Clary also noted that there were no signs warning motorists of the danger and shoulder conditions. He noted that DOTD would have had notice of the problems when they performed the repair and overlay or reconstruction work the month before the accident.
Geneva Grille (Grille), district design water resources and development engineer for DOTD, testified that she was employed by DOTD for 17 years and did the design work for the overlay project. She admitted that no effort was made to correct or improve the shoulder conditions and that defendant was aware of the condition of the roadway. Grille agreed that the River Road is sub-standard. However, she testified that the road is not overly dangerous for the speed limit. She stated that this was a maintenance project and not a reconstruction. This was also supported by DOTD's expert in traffic engineering and highway design, traffic safety and accident reconstruction, Dr. Olin Dart, Jr. He admitted that if the road had been designed in 1990, it would have been far below minimum tolerable conditions and at least eight foot shoulders would be required. Furthermore, if the road was being rebuilt, it would have to follow the standards of the American Association of State *208 Highway and Transportation Official (AASHTO), which the State has been required to adopt for 15 to 20 years. Under those standards, the state would be required to build 12 foot lanes, 10 foot shoulders and slopes of "four to one."[5]
In Begnaud v. Department of Transp. and Development, 93-639 (La.App. 5 Cir. 1/12/94), 631 So.2d 467 we stated:
The DOTD owes a duty to travelers to keep the highways and their shoulders in a reasonably safe condition. Myers v. State Farm Mutual Auto. Ins. Co., 493 So.2d 1170 (La.1986). Whether DOTD breached this duty depends upon the particular facts and circumstances of each case.
631 So.2d at 469.
We further held that:
This duty encompasses the foreseeable risk that, for any number of reasons including simple inadvertence, a motorist might find himself travelling on, or partially on the shoulder. A motorist has the right to assume that a highway shoulder, the function of which is to accommodate motor vehicles intentionally or unintentionally driven thereon, is maintained in a reasonably safe condition. Rue v. State, Department of Highways, 372 So.2d 1197 (La.1979); LeBlanc v. State, 419 So.2d 853 (La.1982). Again, the proper inquiry is whether or not, as a factual matter, the absence of a shoulder, or the presence of an inadequate shoulder, creates an unreasonable risk of harm. Myers, supra.
631 So.2d at 470.
The court of appeal may not set aside the findings of fact in the absence of manifest error or unless the findings are clearly wrong. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989); O'Boyle v. Piglia, 95-990 (La. App. 5 Cir. 2/27/96); 670 So.2d 1339, 1342. After reviewing the evidence in this case, we find that the trial judge was not clearly wrong in finding DOTD liable under both strict liability and negligence because the defective condition of the road creates an unreasonable risk of harm under either theory of recovery. Thus, the judgment will be affirmed.
Accordingly, the judgment of the trial court is hereby affirmed.
Costs of the appeal are to be paid for by DOTD.
AFFIRMED.
NOTES
[1] Dr. Kinnard testified by deposition.
[2] Dr. Johnson's narrative report was admitted in lieu of live testimony.
[3] Plaintiff was awarded future medical expenses of $35,000, past lost wages of $47,767.50, past medical expenses of $16,058.35 and future lost wages of $10,000, based on her ability to perform light sedentary office type work and her ability to return to college to complete her remaining two years.
[4] 23 U.S.C. 130 pertains to Railroad Highway Crossings; 23 U.S.C. 144 relates to bridge replacement and rehabilitation and 23 U.S.C. 152 provides for federal funding of state highway hazard elimination projects.
[5] This figure was unexplained.